**In re TBR USA, INC., Debtor.**

No. 06–60429 jpk.

United States Bankruptcy Court,
N.D. Indiana,
Hammond Division.

Jan. 7, 2010.

---

Gordon E. Gouveia, Catherine Molnar–Boncela, Gouveia & Associates, P.C., Merrillville, IN, for Worstell Business Trust, John Worstell and Diane Worstell.

Stacia L. Yoon, Genetos, Retson, Yoon & Molina, LLP, Merrillville, IN, for Chapter 7 Trustee.

### MEMORANDUM AND DECISION CONCERNING DISPUTED ELECTION

J. PHILIP KLINGEBERGER, Bankruptcy Judge.

This matter is before the court for a final decision concerning the disputed election of a Chapter 7 Trustee. On March 15, 2006, the debtor, TBR USA, Inc. ("TBR"), filed a petition for relief under Chapter 11

of the United States Bankruptcy Code. Subsequently, on November 3, 2006, the court granted TBR's motion to convert this case from a case pending under Chapter 11 to a case under Chapter 7 of the United States Bankruptcy Code. The § 341 meeting of creditors was scheduled to take place on December 5, 2006, and Stacia L. Yoon was appointed as the Chapter 7 Interim Trustee ("Trustee"). On November 27, 2006, the Interim Trustee and counsel for TBR agreed to continue the § 341 meeting to January 4, 2007.[1]

On January 4, 2007, creditors John Worstell, Diane Worstell, the Worstell Business Trust and Langer & Langer, P.C. ("Creditors") appeared by proxy at the § 341 meeting; requested the election of a trustee; and sought to elect Daniel L. Freeland as the Trustee in this case. On that same day, but prior to the § 341 meeting, counsel for the Creditors had filed a document entitled, "Statement Pursuant to Rule 2006(e) Concerning Proxies". Attached as exhibits to this statement were separate documents for each entity entitled, "Proxy and Special Power of Attorney for Meeting of Creditors and Election of Trustee". The ostensible purpose of this document was twofold: first, to appoint the firm of Gouveia & Associates as attorney in fact for that specific creditor; second, to authorize Gouveia & Associates to attend the meeting of creditors and vote for the appointment of Daniel L. Freeland as Chapter 7 Trustee.

At the § 341 meeting, a number of ballots were presented to Trustee Yoon.[2] The first ballot was a vote for Daniel L. Freeland cast on behalf of the creditor Langer & Langer. The ballot was signed by Gordon E. Gouveia as proxy and indicated that this entity filed claim # 5–2 on March 29, 2006 and claimed an unsecured debt in the amount of $1,071.75. The second ballot was a vote for Daniel L. Freeland and was cast on behalf of three different creditors–John Worstell, Diane Worstell and the Worstell Business Trust. This ballot represented claim # 2–3 filed by John and Diane Worstell on November 17, 2006; claim # 3–2 filed by John Worstell on August 30, 2006; claim # 4–4 filed by the Worstell Business Trust on November 17, 2006; and claim # 27–2 filed by John Worstell on December 12, 2006. The ballot disclosed unsecured debt in the amount of $877,099.52 and was signed by Gordon E. Gouveia, Esq. as attorney for these particular creditors. Finally, the last ballot was a vote for Stacia L. Yoon and was cast on behalf of the law firm Baker & Daniels, L.L.P. This ballot represented claim # 30–1 and was submitted and signed by Kathryn E. Anderson, Esq. as attorney for the creditor. At the final evidentiary hearing, the Trustee conceded that Baker & Daniels, L.L.P. was ineligible to vote in the election due to the fact that it holds an administrative claim.[3] The following is a summary of the voting claims in dispute by the Interim Trustee:

| CREDITOR | PROOF OF CLAIM AMOUNT | Claim # on Claims Register and Date Proof of Claim was Filed |
| --- | --- | --- |

1. On December 21, 2006, by order of the court, the attorneys for TBR were granted leave to withdraw; TBR has been proceeding *pro se* ever since.

2. Though not formally entered into evidence, the court notes that the ballots were attached as exhibits to the United States Trustee's Report of Disputed Election.

3. *See*, Trial Transcript, pg. 105, lines 1–25 through pg. 106 lines 1–7.

| | | | |
|---|---|---|---|
| John & Diane Worstell | $ 65,000.00 | Secured | # 2–3 11/17/06 (Amended) [4] |
| | $152,551.49 | Unsecured | |
| John & Diane Worstell | $175,171.34 | Unsecured | # 3–2 8/30/06 (Amended) [5] |
| Worstell Business Trust | $ 65,000.00 | Secured | # 4–3 11/17/06 (Amended) [6] |
| | $499,454.28 | Unsecured | |
| Langer & Langer | $ 1,071.75 | Unsecured | # 5 3/29/06 |
| John Worstell | $ 65,000.00 | Secured | # 27–2 12/12/06 (Amended) [7] |
| | $ 48,922.41 | Unsecured | |
| **TOTAL:** | **$877,171.27** | **Unsecured** | |

On February 7, 2007, the United States Trustee filed a document, entitled "United States Trustee's Report of Disputed Election", which raised several issues concerning the validity of the election, as follows:

At the § 341 Meeting, Trustee Yoon objected to the election request of all of the parties listed in Table A. Trustee Yoon objected to the eligibility of these parties to vote in an election, to the solicitation of Langer & Langer's proxy, and to the proxies themselves. In general, Trustee Yoon contends that the Worstells and the Worstell Business Trust are disqualified from requesting or voting in an election because their claims are secured, disputed, not fixed, not liquidated. Trustee Yoon further argues that the Worstells and the Worstell Business Trust are disqualified because they have interests that are materially adverse to other unsecured creditors—because their claims are secured, because they may have a preference resulting from a pre-petition, pre-judgment attachment lien against property of the Debtor, and because there is litigation pending in the U.S. District Court for the Northern District of Indiana between the Debtor, the Worstells, and the Worstell Business Trust. According to the Trustee, this litigation includes a counter-claim that the Debtor, now the bankruptcy estate, has against John Worstell and the Worstell Business Trust. According to the Trustee, because of this lawsuit, the Worstells and the Worstell Business Trust have competing and materially adverse interests to the unsecured creditors.

4. This claim is for a deficiency pursuant to an equipment lease (a router) between the claimants and TBR. The claim is partially secured by virtue of the fact that the Worstells filed a lawsuit in state court and a prejudgment order of attachment was subsequently entered.

5. Prior to filing its petition for relief, TBR USA, Inc. became obligated on two loans from Mercantile National Bank. In order to be deemed creditworthy, Mercantile required that the loans be personally guaranteed-which John Worstell agreed to do. After the filing of the petition, the bank demanded that the loan balance be paid in the amount of $175,171.34, as required by the guarantees. In exchange, the bank assigned to Worstell any claim it may have *vis-a-vis* TBR USA, Inc. Based on this assignment, John Worstell filed the foregoing claim. The significance of claim # 3–2 for the election of a trustee pursuant to 11 U.S.C. § 702 will be discussed in greater detail *infra*.

6. This claim arises out of a lease of the business premises between TBR and the Worstell Business Trust. The claim is partially secured by virtue of the fact that a lawsuit was filed in state court and a prejudgment order of attachment was subsequently entered.

7. This claim arises out of a promissory note executed on April 8, 2005, between TBR and John Worstell. The claim is partially secured by virtue of the fact that a lawsuit was filed in state court and a prejudgment order of attachment was subsequently entered.

Trustee Yoon further contends that John Worstell should be disqualified because the Trustee claims that he is an insider of the Debtor. As to Langer & Langer, Trustee Yoon contends that this creditor may not request an election by proxy, or vote by proxy, because this creditor was improperly solicited. According to the Trustee, creditors who are disqualified from requesting an election are prohibited from soliciting other creditors to request an election. Finally, Trustee Yoon contends that the proxy forms are, themselves, deficient and/or invalid and that requests for an election via proxy should not be allowed.[8]

On February 8, 2007, the Interim Trustee filed a Motion for Resolution of Dispute, requesting that the court resolve the disputed election; and a Motion to Enforce Restrictions on Solicitation, alleging that Diane Worstell, John Worstell and the Worstell Business Trust (the "Worstells") violated the restrictions on solicitation as provided for by Fed.R.Bankr.P.2006. On February 20, 2007, counsel for the Worstells filed a response to each of the foregoing motions and to the report filed by the United States Trustee, taking the position that the election was valid, and that Daniel L. Freeland had been elected as the Trustee in this case. The court held a preliminary pretrial conference on March 22, 2007, and on April 20, 2007 entered an order setting an evidentiary hearing for April 26, 2007 on the United States Trustee's report, the Interim Trustee's Motion for Resolution of Dispute and Motion to

Enforce Restrictions on Solicitation, and on all of the responses filed thereto.

On April 23, 2009, the parties filed a joint statement regarding the witnesses, exhibits and issues to be presented at the final evidentiary hearing. At the conclusion of the final hearing, prior to the close of evidence, counsel for the Worstells orally moved that the court conditionally allow claim # 3–2, filed by John and Diane Worstell, for purposes of voting. The claim was originally filed on August 30, 2006, and was objected to by TBR on September 11, 2006. As of the final hearing the claim objection had not yet been resolved, and the court denied the motion to conditionally allow the claim. On May 14, 2007, the Worstells filed a Motion for Leave to Appeal this decision. On March 12, 2009, the District Court for the Northern District of Indiana affirmed this court's ruling which denied Worstells' motion to conditionally allow claim # 3–2 for the purpose of voting in the election of a Chapter 7 Trustee and remanded the matter back for further proceedings.[9] On April 29, 2009 the court held a status conference, at which time it was determined that the record before the court for the final disposition of all pending matters[10] is comprised of the following: the Statement Regarding Hearing Procedures filed on April 23, 2007; the record of the hearing held on April 26, 2007; the legal memorandum filed by the Chapter 7 Trustee on May 14, 2007; and the legal memorandum filed by John and Diane Worstell, and the Worstell Business Trust on May 14, 2007.

---

8. *See,* United States Trustee's Report of Disputed Election at ¶ 23.

9. *John and Diane Worstell v. Yoon,* 2:07 CV 170.

10. The pending matters are as follows: the United States Trustee's Report for Disputed

Election filed on February 7, 2007, Interim Trustee Stacia L. Yoon's Motion for Resolution of Dispute and Motion to Enforce Restrictions on Solicitation both filed on February 8, 2007, and the responses to the foregoing filings filed by Diane Worstell, John Worstell and the Worstell Business Trust on February 20, 2007.

At the final evidentiary hearing, the Worstells entered the following exhibits into evidence:

Proof of Claim # 4–4 filed by the Worstell Business Trust—Worstell Exhibit # 1

Proof of Claim # 2–3 filed by John and Diane Worstell—Worstell Exhibit # 2

Proof of Claim # 3–2 filed by John and Diane Worstell—Worstell Exhibit # 3

Proof of Claim # 27–2 filed by John Worstell—Worstell Exhibit # 4

Motion for Relief from Stay filed by ALF Operating Partners—Worstell Exhibit # 5

Letter from Gordon Gouveia to Langer & Langer, P.C.—Worstell Exhibit # 6

Equipment Lease between John A. Worstell and TBR—Worstell Exhibit # 7

Commercial Lease between the Worstell Business Trust and TBR—Worstell Exhibit # 8

The Interim Trustee entered the following exhibits into evidence:

Unanimous Consent of Directors of TBR USA, Inc.—Interim Trustee's Exhibit A

Stockholder Agreement—Interim Trustee's Exhibit B [11]

Stock Certificates—Interim Trustee's Exhibit C

Employment Agreement—Interim Trustee's Exhibit D

Allocation Schedule—Interim Trustee's Exhibit E

Unanimous Consent of Directors of TBR USA, Inc.—Interim Trustee's Exhibit F

Corporate Resolution—Interim Trustee's Exhibit G

Minutes of TBR's Board Meeting, dated August 6, 2004—Interim Trustee's Exhibit H–1

Minutes of TBR's Board Meeting, dated November 1—Interim Trustee's Exhibit H–2 [12]

Minutes of TBR's Board Meeting held April 7–8 (2005)—Interim Trustee's Exhibit H–3 [13]

Minutes of TBR's Board Meeting held July 28–29 (2005)—Interim Trustee's Exhibit H–4 [14]

Cash Requirement Listing—Interim Trustee's Exhibit I [15]

Group of several emails—Interim Trustee's Exhibit J–1 through J–8 [16]

Group of several checks from TBR to certain creditors—Interim Trustee's Exhibit K [17]

---

**11.** The admissibility of Exhibit B is limited to show that John Worstell participated in the negotiation and signing of this agreement.

**12.** Exhibit H–2 is admitted with the qualification that the agenda in the form as attached to this document was not provided to Worstell.

**13.** The admissibility of Exhibit H–3 is limited in that the notes made by John Worstell are excluded as evidence.

**14.** The admissibility of Exhibit H–4 is limited to show that John Worstell attended this particular meeting.

**15.** The admissibility of Exhibit I is limited to show that John Worstell discussed this particular document with other representatives of TBR, and not for the truth of matters stated in the document.

**16.** The admissibility of Exhibit J–1 through J–8 is limited to show that John Worstell was included in the distribution list and copied on these particular emails and not for the truth of the matters stated in the emails. Just as an aside, there is no direct evidence that John Worstell actually *received* these emails.

**17.** The admissibility of Exhibit K is limited to show that John Worstell signed this grouping of checks; not that they were negotiated or that he had signatory authority on the account.

Newspaper article—Interim Trustee's Exhibit L

Complaint filed by John Worstell and the Worstell Business Trust—Interim Trustee's Exhibit M

Order of Attachment entered by the Porter County Superior Court—Interim Trustee's Exhibit N

Order denying a motion to vacate a prejudgment attachment order—Interim Trustee's Exhibit O

The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(a) and (b), 28 U.S.C. § 157(b)(1) and N.D.Ind. L.R. 200.1(e). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A). Venue before this court is proper pursuant to 28 U.S.C. § 1409(a). This Memorandum and Decision constitutes the findings of fact and conclusions of law required by Fed.R.Bankr.P. 7052/Fed.R.Civ.P. 52(a).

*ISSUES PRESENTED*
*TO THE COURT*

The parties did not present a joint statement of issues to the court. In the Statement Regarding Hearing Procedures jointly filed by the parties on April 23, 2009, each party separately framed the issues before the Court for final determination:

TRUSTEE'S ISSUES OF LAW:

1. Whether the Worstells are disqualified from requesting an election of Trustee for the following reasons:

 A. Because the Worstells are secured creditors;

 B. Because, even if the Worstells have an unsecured claim, such claim is not allowable under 11 U.S.C. § 502(d);

 C. Because the Worstells' interests are materially adverse to the interests of the unsecured creditors;

 D. Because John Worstell is an "insider," and;

 E. Because Worstell Business Trust is an "insider."

2. Whether the Worstells made an unauthorized solicitation of the Langer and Langer proxy under Fed. R.Bankr.P.2006.

3. Whether the proxies cast at the disputed election are valid under this court's holding in *In re Stubbs.*

4. Whether Baker & Daniels possesses a valid claim and whether this claim allows them to vote in the trustee's election.

WORSTELLS' ISSUES OF LAW:

1. Whether John Worstell, as a minority shareholder who was not an officer, director, or person in control of TBR on the filing date, is an insider of TBR pursuant to 11 U.S.C. §§ 101(31)1 and 702(a) on or after the date of filing.

2. Whether John Worstell has interests that disqualify him from voting pursuant to §§ 702 or 502(d) on or after the date of filing.

3. Whether an interest arising from a prejudgment attachment is a secured interest where all the assets are subject to a super priority administrative claim that exceeds the value of the assets and which assets are no longer property of the estate.

4. Whether a claim filed as secured should be treated as an unsecured claim where the collateral securing the claim is subject to a super priority administrative claim that exceeds the value of the assets and which assets are no longer property of the estate.

5. Whether Diane Worstell is entitled to vote her interest in claim # 2,

# 3 and # 4 in favor of the election of a Trustee pursuant to 11 U.S.C. § 702(a)(1) on or after the date of filing.

6. Whether Diane Worstell has interests that disqualify her from voting pursuant to §§ 702 or 502(d) on the date of the election.

7. Whether the Worstell Business Trust, organized under Indiana law, is entitled to vote its interest in claim # 4 in favor of the election of a Trustee on or after the date of filing.

8. Whether an attorney for the Worstell Business Trust, John and Diane Worstell can vote for a trustee with or without a proxy pursuant to 11 U.S.C. § 702 and Fed. R. Bankr. P.2006(b).

9. Whether creditors holding 20% in amount of the claims entitled to vote pursuant to 11 U.S.C. § 702(a)(1) requested the election of a trustee pursuant to 11 U.S.C. § 702(b).

10. Whether Daniel Freeland was elected Trustee pursuant to 11 U.S.C. § 702(c).

The substantive issues before the court may be distilled down to the following:

1. The "universe" of claims under 11 U.S.C. § 702(a)(1).

2. The effect of 11 U.S.C. § 702(a)(2) as applied to this case.

3. The effect of 11 U.S.C. § 702(a)(3) as applied to this case.

4. The qualification of voters to vote pursuant to the proxies held/submitted in relation to the election.

5. The result of the election for trustee based upon determination of the foregoing issues.

*ANALYSIS*

The requirements for conducting an election of a permanent trustee are found at 11 U.S.C. § 702, which states:

§ 702. Election of trustee

(a) A creditor may vote for a candidate for trustee only if such creditor—

(1) holds an allowable, undisputed, fixed, liquidated, unsecured claim of a kind entitled to distribution under section 726(a)(2), 726(a)(3), 726(a)(4), 752(a), 766(h), or 766(I) of this title [11 USCS § 726(a)(2), 726(a)(3), 726(a)(4), 752(a), 766(h), or 766(I)];

(2) does not have an interest materially adverse, other than an equity interest that is not substantial in relation to such creditor's interest as a creditor, to the interest of creditors entitled to such distribution; and

(3) is not an insider.

(b) At the meeting of creditors held under section 341 of this title [11 USCS § 341], creditors may elect one person to serve as trustee in the case if election of a trustee is requested by creditors that may vote under subsection (a) of this section, and that hold at least 20 percent in amount of the claims specified in subsection (a)(1) of this section that are held by creditors that may vote under subsection (a) of this section.

(c) A candidate for trustee is elected trustee if—

(1) creditors holding at least 20 percent in amount of the claims of a kind specified in subsection (a)(1) of this section that are held by creditors that may vote under subsection (a) of this section vote; and

(2) such candidate receives the votes of creditors holding a majority in amount of claims specified in subsection (a)(1) of this section that are held by creditors that vote for a trustee.

(d) If a trustee is not elected under this section, then the interim trustee shall serve as trustee in the case.

§ 702 is implemented by Fed. R. Bankr.P. 2003, which provides in pertinent part:

(b) Order of meeting.

(1) *Meeting of creditors.* The United States trustee shall preside at the meeting of creditors. The business of the meeting shall include the examination of the debtor under oath and, in a chapter 7 liquidation case, may include the election of a creditors' committee and, if the case is not under subchapter V of chapter 7, the election of a trustee. The presiding officer shall have the authority to administer oaths.

(2) *Meeting of equity security holders.* If the United States trustee convenes a meeting of equity security holders pursuant to § 341(b) of the Code, the United States trustee shall fix a date for the meeting and shall preside.

(3) *Right to vote.* In a chapter 7 liquidation case, a creditor is entitled to vote at a meeting if, at or before the meeting, the creditor has filed a proof of claim or a writing setting forth facts evidencing a right to vote pursuant to § 702(a) of the Code unless objection is made to the claim or the proof of claim is insufficient on its face. A creditor of a partnership may file a proof of claim or writing evidencing a right to vote for the trustee for the estate of a general partner notwithstanding that a trustee for the estate of the partnership has previously qualified. In the event of an objection to the amount or allowability of a claim for the purpose of voting, unless the court orders otherwise, the United States trustee shall tabulate the votes for each alternative presented by the dispute and, if resolution of such dispute is necessary to determine the result of the election, the tabulations for each alternative shall be reported to the court.

(c) Record of meeting. Any examination under oath at the meeting of creditors held pursuant to § 341(a) of the Code shall be recorded verbatim by the United States trustee using electronic sound recording equipment or other means of recording, and such record shall be preserved by the United States trustee and available for public access until two years after the conclusion of the meeting of creditors. Upon request of any entity, the United States trustee shall certify and provide a copy or transcript of such recording at the entity's expense.

(d) Report of election and resolution of disputes in a chapter 7 case.

(1) *Report of undisputed election.* In a chapter 7 case, if the election of a trustee or a member of a creditors' committee is not disputed, the United States trustee shall promptly file a report of the election, including the name and address of the person or entity elected and a statement that the election is undisputed.

(2) *Disputed election.* If the election is disputed, the United States trustee shall promptly file a report stating that the election is disputed, informing the court of the nature of the dispute, and listing the name and address of any candidate elected under any alternative presented by the dispute. No later than the date on which the report is filed, the United States trustee shall mail a copy of the report to any party in interest that has made a request to receive a copy of the report. Pending disposition by the court of a disputed election for trustee, the interim trustee shall continue in office. Unless a motion for the resolution of the dispute is filed no later than 10 days after the United States

trustee files a report of a disputed election for trustee, the interim trustee shall serve as trustee in the case.

In order for an election to be held, § 702(b) provides that at least 20% of those creditors who "may vote", as defined in § 702(a) must request an election at the § 341 meeting; *In re Michelex Limited,* 195 B.R. 993, 998 (Bankr.W.D.Mich.1996). When an election has been properly requested, the only creditors who "may vote" under § 702(a) are those who: (1) hold "an allowable, undisputed, fixed, liquidated, unsecured claim of a kind entitled to distribution under section 726(a)(2), 726(a)(3), 726(a)(4), 752(a), 766(h), or 766(I)"; (2) who do not have an interest, "materially adverse, other than an equity interest that is not substantial in relation to such creditor's interest as a creditor, to the interest of creditors entitled to such distribution"; and (3) who are not "insiders".

■ Once this threshold is met, under § 702(c) a trustee is elected if and only if qualifying voting creditors holding twenty percent of the eligible claims actually vote, and a majority in the amount of such claims vote for that particular candidate. 11 U.S.C. § 702(c)(1); *In re Oxborrow,* 913 F.2d 751, 753 (9th Cir.1990); *In re Michelex Limited,* 195 B.R. 993, 998–99 (Bankr. W.D.Mich.1996) (If the requisite percentage of creditors request an election, at least 20% of those creditors who may vote must actually vote in the election for the election to be valid. § 702(c)(1)). The twenty percent requirement of § 702(b) is distinct and independent of the voting requirement of § 702(c); *See, In re Oxborrow,* 913 F.2d 751, 754 (9th Cir.1990); *In re Northwest Family Hospital,* Bankruptcy No. 95–62628 (Bankr.N.D.Ind.1996) (unpublished). In other words, creditors holding 20% of the claims specified by the statute must request the election. Then, creditors holding 20% percent of the

claims qualifying for the election process to be initiated, as specified by the statute, must **actually vote,** and a majority of those claims so voting are required for the election of a trustee other than the interim trustee.

11 U.S.C. § 702(a) does not expressly require that a creditor file a proof of claim. But, Fed.R.Bankr.P.2003(b)(3) states that "a creditor is entitled to vote" at a trustee election if the creditor has filed a proof of claim, or other sufficient writing, prior to, or at, the § 341 meeting. Regardless, § 702(a)(1) clearly requires that, in order to vote, the creditor must have *an allowable claim.* If an objection to a claim has been filed, that claim cannot be counted among the § 702(a)(1) claims for purposes of either requesting an election or for voting in one. *In re San Diego Symphony Orchestra Assn.,* 201 B.R. 978, 980 (Bankr. S.D.Cal.1996); *In re Aspen Marine Group, Inc.,* 189 B.R. 859, 862–63 (Bankr. S.D.Fla.1995); *See also, John and Diane Worstell v. Yoon,* 2:07 CV 170 (N.D.Ind. 2009).

A. *The Claims Universe Under 11 U.S.C. § 702(a)(1)*

■ The threshold question is the manner in which the court should determine the composition of the creditor body for purposes § 702(a)(1). 11 U.S.C. § 702, as supplemented by Fed.R.Bankr.P. 2003(b)(3), is clear as to the methodology. There are currently two primary methodologies for deriving the universe of claims necessary for analyzing an issue arising under 11 U.S.C. § 702, as developed by case law. The court does not completely agree with either one. Because this case was initiated as a Chapter 11 case, for the purposes of this case the court's dissension is not material. However, as the template for future cases initiated under Chapter 7, the court's approach is worth stating.

The court initially notes that it is *extremely* important that definite parameters be determined so that a trustee election can be effected as promptly as possible in order to avoid a delay in administration of the case arising from an election disputed because of eligibility of creditors to vote for a trustee. As a result, relatively clear rules must be derived to resolve potential disputes at the initial election stage. Although Fed.R.Bankr.P.2003(d)(2) provides that in the event of a disputed election and disposition of that dispute by a court, "the interim trustee shall continue in office", it is fair to neither the interim trustee nor to creditors participating in the election to continue full substantive administration of the estate until the trustee election has been resolved. Moreover, it is the court's perception that most interim trustees would be hesitant to significantly administer a Chapter 7 bankruptcy estate under a circumstance in which a disputed trustee election challenged the interim trustee's eligibility to finally administer the estate.

11 U.S.C. § 702(a) provides three criteria for eligibility for a creditor to vote for a candidate for trustee: (1) the creditor must hold "an allowable, undisputed, fixed, liquidated, unsecured claim" within the definition of certain claims provided for by designated statutes; (2) the creditor must not have an interest "materially adverse ... to the interest of creditors entitled to distribution" in a Chapter 7 case; and (3) the creditor cannot be an insider.

Neither the Bankruptcy Code nor the Federal Rules of Bankruptcy Procedure provide a definition of "an interest materially adverse ... to the interest of creditors entitled to [distribution in a Chapter 7 case]" with respect to claims of the nature of those described in 11 U.S.C. § 702(a)(1). Therefore, by necessity, there will be circumstances in which a factual determination is necessary with respect to eligibility to vote under 11 U.S.C. § 702(a)(2). However, certain bright line rules can be established with respect to that eligibility.

The term "insider", relevant under 11 U.S.C. § 702(a)(3), is a term in part defined by 11 U.S.C. § 101(31). However, the list of "insiders" statutorily defined by that provision is not inclusive, and in certain circumstances it will be necessary to review whether or not a particular creditor under particular circumstances is or is not an insider under that provision. Again, however, certain bright line rules can be established.

The easiest of the eligibility requirements stated in 11 U.S.C. § 702(a) to establish is that provided for by 11 U.S.C. § 702(a)(1). It is in this context that presently decided case law is most in disagreement. The "majority rule", if you will [18], perceives an ambiguity in the use of the term "allowable" in § 702(a)(1), which has led some courts to look to a debtor's schedules to determine the initial "claims universe" by applying the legislative history of the statute to resolve this perceived ambiguity. This court perceives *no* ambiguity, and therefore departs from nearly every decided decision on this issue.

The term "allowable" as utilized in 11 U.S.C. § 702(a)(1) has a scope easily derived from provisions of the Bankruptcy Code and of the Federal Rules of Bankruptcy Procedure. 11 U.S.C. § 502 specifically provides for "Allowance of claims or interests", and it is to this statute that recourse must first be had. 11 U.S.C. § 502(a) states:

(a) A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, including a creditor of a general

---

**18.** There aren't a lot of reported decisions on this issue to begin with.

partner in a partnership that is a debtor in a case under chapter 7 of this title, objects.

This concept of an allowable claim is further supplemented by Fed.R.Bankr.P. 3001(f)'s standard that a properly executed and filed claim is "prima facie evidence of the validity and amount of the claim", and by the requirements of Fed.R.Bankr.P. 3001(c) and (d) as to the substantiating documentation required as to certain categories of claims. A satisfactory proof of claim filed in a bankruptcy case is deemed allowed until objected to, and thus a creditor which has filed a proof of claim prior to the trustee election which satisfies the foregoing criteria has an "allowable" claim under 11 U.S.C. § 702(a)(1), subject to customary review of claims to winnow out those which are clearly unsupported by any applicable law or principle, a process provided for by Fed.R.Bankr.P.2003(b)(3)'s provision that a creditor is not entitled to vote if its proof of claim "is insufficient on its face". In this context, Fed.R.Bankr.P. 2003(b)(3) does nothing more than state the law of claims review which is customarily enforced by bankruptcy courts: facially insufficient or invalid claims are not initially "allowable".

The only other provision of the Bankruptcy Code or of the Federal Rules of Bankruptcy Procedure which relates to the concept of an "allowable" claim is Fed. R.Bankr.P. 3003(b)(1), which states:

(b) Schedule of liabilities and list of equity security holders

(1) Schedule of liabilities

The schedule of liabilities filed pursuant to § 521(1) of the Code shall constitute prima facie evidence of the validity and amount of the claims of creditors, unless they are scheduled as disputed, contingent, or unliquidated. It shall not be necessary for a creditor or equity security holder to file a proof of claim or interest except as provided in subdivision (c)(2) of this rule.

This Rule provides that in a Chapter 11 case, the Schedules filed by the debtor constitute *"prima facie* evidence of the validity and amount of the claims of creditors", unless those debts are scheduled with a certain designation. A "claim" [in the context of its definition by 11 U.S.C. § 101(5)] is deemed allowed for all purposes in the Chapter 11 case if the scheduling of that "claim" meets the criteria of Rule 3003(b)(1). Again, the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure provide a ready definition of an "allowable" claim within the context of § 702(a)(1).

There is no ambiguity in 11 U.S.C. § 702(a)(1) with respect to the concept of an "allowable" claim. For the purposes of that section, if a creditor has filed a proof of claim which complies with 11 U.S.C. § 3001/Fed.R.Bankr.P.2003(b)(3) prior to the trustee election, which claim otherwise satisfies the criteria of § 702(a)(1)—that creditor has an "allowable" claim for the purposes of that section [putting aside whether the creditor may otherwise be disqualified by the other two subsections of 11 U.S.C. § 702(a)]. If the case originated as a Chapter 11 case and the debt (claim) of the creditor satisfies the requirements of Fed.R.Bankr.P. 3003(b)(1), that creditor—subject again to the qualifying requirements of the three subsections of § 702(a)—has an "allowable" claim within the scope of 11 U.S.C. § 702(a)(1). These two classes of potentially eligible creditors with "allowed" claims constitute the total universe provided by the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure, and there is no ambiguity in 11 U.S.C. § 702(a)(1) as to the determination of an "allowable" claim.

The majority of decided opinions which have defined the initial claims universe have found an ambiguity by use of the term "allowable"; have relied on legislative history, as dubious as that reliance is; and have essentially defined the claims universe [apart from Fed.R.Bankr.P. 3003(b)(1)] as being any "debt" [*see*, 11 U.S.C. § 101(12)] listed in schedules as being other than disputed, contingent or unliquidated. The manner in which a scheduled liability rises to the status of an "allowable" claim in other than a Chapter 11 case escapes the court: there is no provision of the Bankruptcy Code or of the Federal Rules of Bankruptcy Procedure which provides in any manner for the allowance of a scheduled debt as a "claim" against a bankruptcy estate in the context of anything other than a Chapter 11 case. Moreover, the court submits that the "evil" addressed by the legislative history of § 702 was primarily the perceived gerrymandering of the election of the Chapter 7 trustee in cases that originated as cases under Chapter 11, not in cases that began under Chapter 7. The "big hit" Chapter 7 cases in which collusion may or may not have occurred back in the day in relation to election of the Chapter 7 trustee and retention/appointment by that trustee, as attorney for the trustee, of attorneys for interested/voting creditors—were primarily converted Chapter 11 cases. It is a relatively rare major Chapter 7 case, in terms of a significant pool of property of the estate requiring administration, that originates as a Chapter 7 case. In this light, even if one were to take into account the legislative history of § 702, the focus of the beam would be on converted Chapter

11 cases, thus causing the use of the word "allowable" in § 702(a)(1) to be entirely consistent with Fed.R.Bankr.P. 3003(b)(1), and inconsistent with the concept that any debt scheduled in a certain manner in schedules filed in a case other than under Chapter 11 generates an "allowable" claim.

Thus, to initially define the "claims universe" under 11 U.S.C. § 702(a)(1), that universe is comprised of every creditor who has filed a satisfactory proof of claim—which is not objected to as of the date of the election or is insufficient on its face [Fed.R.Bankr.P.2003(b)(3)]—or who meets the criteria of Fed.R.Bankr.P. 3003(b)(1) if the case in which the trustee election arises originated as a Chapter 11 case and by the time of the election no separate order has been entered requiring creditors in the Chapter 11 case to file separate proofs of claim in the Chapter 7 case. This result is absolutely made clear by a consistent interpretation of separate sections of the Bankruptcy Code and of the Federal Rules of Bankruptcy Procedure, and there is no room for any statutory construction as to the ambiguity of the term "allowable" in 11 U.S.C. § 702(a)(1). Construed in this manner, the provision of Fed.R.Bankr.P.2003(b)(3)—which provides for entitlement to vote at the election of a Chapter 7 trustee to be determined by either the filing of a proof of claim or the filing of "a writing setting forth facts evidencing a right to vote pursuant to § 702(a) of the Code"—in the latter context simply requires a creditor relying on Fed.R.Bankr.P. 3003(b)(1) to file a document with respect to eligibility under that provision.[19]

---

**19.** It must be borne in mind that all of the provisions at issue in this context were enacted prior to the mass implementation of electronic filing by federal bankruptcy courts, and the resulting immediate access to schedules filed by a debtor and other documents filed in a case. Any "writing" as referred to in Fed.R.Bankr.P.2003(b)(3) must of necessity satisfy the requirements of Fed.R.Bankr.P. 9011, a potent stop-gap to the assertion of an invalid right to vote. A creditor can be entitled to vote by operation of Fed.R.Bankr.P.

As noted, this court's determination departs from that stated in previously reported decisions; Compare, *In re Michelex, Limited,* 195 B.R. 993 (Bankr. W.D.Mich.1996) and *In re Tartan Construction Co.,* 4 B.R. 655 (Bankr.Neb. 1980); with *In re Lake States Commodities, Inc.,* 173 B.R. 642 (Bankr.N.D.Ill. 1994). The court is more aligned with *In re Lake States Commodities, Inc.;* however, that case did not take into account the "allowable" nature of a claim by operation of Fed.R.Bankr.P. 3003(b)(1). The court is in total disagreement with *In re Michelex, Limited,* and the cases which follow its analysis. These cases determine that the term "allowable" in 11 U.S.C. § 702(a)(1) is ambiguous, and then resort to a purported adoption of the legislative intent of the amendment to that statute with respect to eligibility for voting in an election for a Chapter 7 trustee. As stated in *Lamie v. United States Trustee,* 540 U.S. 526, 124 S.Ct. 1023, 1030, 157 L.Ed.2d 1024 (2004):

> The starting point in discerning congressional intent is the existing statutory text, see *Hughes Aircraft Co. v. Jacobson,* 525 U.S. 432, 438, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999), and not the predecessor statutes. It is well established that "when the statute's language is plain, the sole function of the courts-at least where the disposition required by the text is not absurd-is to enforce it according to its terms." *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1, 6, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000) (internal quotation marks omitted) (quoting *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 103

3003(b)(1) apart from the appearance of a proof of claim on a claims register, and it is this entitlement to vote to which Fed.R.Bankr. P.2003(b)(3)'s provision for the filing of a "writing setting forth facts evidencing a right to vote pursuant to § 702(a) of the Code"

L.Ed.2d 290 (1989), in turn quoting *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917)). So we begin with the present statute.

As further stated in *Ex parte Collett,* 337 U.S. 55, 69 S.Ct. 944, 947, 93 L.Ed. 1207 (1949):

> Petitioner's chief argument proceeds not from one side or the other of the literal boundaries of s.1404(a), but from its legislative history. The short answer is that there is no need to refer to the legislative history where the statutory language is clear. 'The plain words and meaning of a statute cannot be overcome by a legislative history which through strained processes of deduction from events of wholly ambiguous significance, may furnish dubious bases for inference in every direction.' *Gemsco v. Walling,* 1945, 324 U.S. 244, 260, 65 S.Ct. 605, 614, 89 L.Ed. 921. This canon of construction has received consistent adherence in our decisions.[FN12]

FN12 *E.g., Packard Motor Car Co. v. National Labor Relations Board,* 1947, 330 U.S. 485, 492, 67 S.Ct. 789, 793, 91 L.Ed. 1040; *United States v. American Trucking Associations,* 1940, 310 U.S. 534, 543, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345; and cases there cited. The rule as to statutory revisions is the same. *Continental Casualty Co. v. United States,* 1942, 314 U.S. 527, 530, 62 S.Ct. 393, 395, 86 L.Ed. 426; *Bate Refrigerating Co. v. Sulzberger,* 1895, 157 U.S. 1, 45, 15 S.Ct. 508, 519, 39 L.Ed. 601; *United States v. Bowen,* 1880, 100 U.S. 508, 513, 15 Ct.Cl. 619, 25 L.Ed. 631.

Because the court does not deem the term "allowable" in 11 U.S.C. § 702(a)(1) to be ambiguous, there is no resort to a principle

refers. Again, this reference is without ambiguity when all provisions of the Bankruptcy Code and of the Federal Rules of Bankruptcy Procedure are reviewed and integrated into a clear framework.

of construction which relies on legislative history. The court would also note that legislative history is a particularly unreliable source for construction of a statute. Posit this: by whom was the legislative history written; how can the author of the legislative history state the intent of the Senate and of the House of Representatives, as separate legislative bodies, in enacting a particular provision, when the enactment is ordinarily the result of a lot of swaps and compromises with respect to the ultimate result; how can the author of the legislative history begin to state the intention of individual Senators and Representatives who voted in favor of the legislation as to its meaning, particularly in the context of an inherently ambiguous statute?

■ The court also notes that the Federal Rules of Bankruptcy Procedure have the same force and effect as federal statutory law; see, McCoy v. Massachusetts Institute of Technology, 950 F.2d 13, 21 (1st Cir.1991), and as such must be reconciled in all possible respects so that a Federal Rule of Bankruptcy Procedure is not construed to be in substantive conflict with a statutory enactment. The cases which utilize a debtor's schedules, outside of the context of Fed.R.Bankr.P. 3003(b)(1), to define the "claims universe" under § 702(a)(1)—do not in any manner seek to reconcile Fed.R.Bankr.P.2003(b)(3) with 11 U.S.C. § 702(a)(1), or reconcile those statutes in their determination by glossing over the conflict created by their decisions.

One other comment is in order. The court perceives that certain cases which determine that there is an ambiguity in the term "allowable" in § 702(a)(1) are reacting to a perceived dysfunction in the trustee election process, as stated in the dubious legislative history with respect to enactment of that section. That dysfunction was purportedly that there was a potential collusion between the bankruptcy bar and potential Chapter 7 trustees with respect to election of a trustee in a Chapter 7 case and employment of an attorney as counsel for the trustee. Thus, the cases seek to expand the universe of "votable" claims to thwart this collusive process. Perhaps that collusion existed in certain cases in certain Districts, but having practiced in the United States Bankruptcy Court for the Northern District of Indiana for over 30 years, the court has never perceived that collusion to be active in this District. Moreover, the full implementation of the United States Trustee system, and the oversight provided by the United States Trustee with respect to "panel" Chapter 7 trustees, has eviscerated concerns about conspiracies relating to election of Chapter 7 trustees. Finally, there are very legitimate reasons why creditors may wish to elect a Chapter 7 trustee other than the interim trustee appointed by random selection, the primary being the ability of the interim trustee to effectively administer a bankruptcy case without an inordinate expenditure of time or expense. These creditors may well be active in the case with respect to an election of the trustee, and their votes should not be diluted by a questionable construction of § 701(a)(1). Apart from the issue of mandated statutory construction, as a matter of policy, the court suggests that this latter principle is more important to uphold than is an essentially artificial device to control perceived "abuse" arising from gerrymandered Chapter 7 trustee elections.

The court concludes that the "universe" of creditors entitled to vote pursuant to 11 U.S.C. § 702(a)(1) is limited to the following:

1. Creditors who have filed satisfactory proofs of claim by the time of the

election, i.e., claims which neither have been objected to prior to that time nor or "insufficient" on the face of the claim; and

2. In the context of this case, creditors who fall within the scope of Fed. R.Bankr.P. 3003(b)(1).

■ In finally establishing this universe, several other considerations adhere. First, a creditor within the scope of Fed. R.Bankr.P. 3003(b)(1), *which files a proof of claim prior to the election which satisfies the criteria of subparagraph 1 immediately above,* will have its voting "claim" determined by the proof of claim, not by the principles of Fed.R.Bankr.P. 3003(b)(1); Fed.R.Bankr.P. 3003(c)(4). Moreover, although late filed claims may be disallowable in certain contexts, if a claim is otherwise "allowable" under the above criteria, because of the express inclusion of late-filed claims in § 702(a)(1)'s designation of claims under 11 U.S.C. § 726(a)(3) as being "allowable", an otherwise "allowable" claim is included in the universe even if otherwise subject to objection on the ground that it was late filed.

■ Finally, in the context of 11 U.S.C. § 702(a)(1), and also 11 U.S.C. § 702(a)(2), the issue arises as to whether a partially secured creditor, or a creditor asserting a priority claim which also asserts an unsecured claim—has an allowable claim under § 702(a)(1), or has an interest "materially adverse" to the interests of creditors having claims of the nature of those described in § 702(a)(1). The court first notes that eligibility to vote under § 702(a)(1) is specifically defined by that section. There is no room in that

section for the "bifurcation" of a claim provided for by 11 U.S.C. § 506(a), as unsecured claims determined under that section do not specifically fall within the provisions of § 702(a)(1). Thus valuing the unsecured component of a claim asserted as solely a secured claim, by recourse to values of property stated in schedules, is not authorized.[20] However, if a creditor, having filed a totally secured claim, then waives that claim as secured prior to the election in a manner which satisfies the "writing" requirement of Fed. R.Bankr.P.2003(b)(3)—or has filed a separate unsecured proof of claim as of that date—what is it in the fact that the creditor has initially asserted a secured claim, or continues to assert a claim secured in part, that causes that assertion to be "materially adverse"? Property with respect to which a creditor has an allowed secured claim is not generally subjected to administration in a Chapter 7 case, and a significant amount of property subject to the allowed secured claims of undersecured creditors is abandoned from the estate at an early stage in the case—either upon motion of the creditor pursuant to 11 U.S.C. § 362(d)(2)/11 U.S.C. § 554(b) or by statement by the trustee pursuant to 11 U.S.C. § 554(a). Unlike many bankruptcy courts, this court has never deemed a secured creditor to be hostile or adverse to the administration of a Chapter 7 estate solely because of its status as a secured or undersecured creditor.[21] The court determines that there is nothing which causes a partially secured creditor to be "materially adverse" within the proscription of 11 U.S.C. § 702(a)(2) with respect to the unsecured portion of its claim *solely* by

---

20. Thus, a creditor which has filed a claim solely as a secured claim is omitted under § 702(a)(1) from the git go.

21. Some courts have stated in their discussions of 11 U.S.C. § 702(a) that secured creditors *ipso facto* have materially adverse interests under § 702(a)(2), but have so stated without much, if any, analysis of why they deem that to be so.

virtue of its asserted status as a partially secured creditor. This rule makes perfect common sense as well. It is far from uncommon for a first priority lien creditor, or a subordinate priority lien creditor, to hold an allowable claim for a debt which greatly exceeds the amount of the creditor's allowed secured claim. In many cases, this circumstance results in that creditor's having an allowed unsecured claim which is the largest unsecured claim, or which exceeds in amount the sum of all other allowed unsecured claims. In this scenario, that creditor has a primary interest—sometimes the primary interest—in seeking to provide that a Chapter 7 case is effectively administered by a Chapter 7 trustee capable of doing so for the benefit of unsecured creditors. What is it about this interest that causes that creditor to be "materially adverse" to the interests of other unsecured creditors solely because a small part of that creditor's debt is covered by realizable collateral? Nothing. Moreover—again—bright line rules are necessary, and hair splitting about how undersecured an undersecured creditor must be to be entitled to vote is contrary to an effective election process. Thus, the court holds that a creditor who asserts a secured claim is not disqualified from voting pursuant to 11 U.S.C. § 702(a)(1)/11 U.S.C. § 702(a)(2) solely by virtue of that assertion.

The same analysis adheres with respect to a creditor asserting a priority claim, who separately asserts an unsecured claim. Whether or not a priority claim exists is subject to a well delineated list in 11 U.S.C. § 507(a), and the provisions for distribution with respect to a priority claim are substantively provided for by 11 U.S.C. § 726(a)(1), by reference to 11 U.S.C. § 507. In principal focus in this context are the claims of taxing authorities—in this Division primarily the claims of the United States of America, Internal Revenue Service and of the Indiana Department of Revenue. The components of the proofs of claim filed by both of these creditors contain in many instances claims asserted pursuant to 11 U.S.C. § 726(a)(4)—a type of claim specifically stated in § 702(a)(1) to give rise to entitlement to vote—in addition to claims for liabilities outside the scope of 11 U.S.C. § 507(a)(8). Because of the statutorily mandated distribution with respect to claims entitled to priority asserted by the Internal Revenue Service and by the Indiana Department of Revenue, separate assertions of a claim falling within the provisions of 11 U.S.C. § 726(a)(4) do not cause those creditors to have "an interest materially adverse" in the context of 11 U.S.C. § 702(a)(2) arising solely from their status as priority creditors. The same is of course true for other creditors who assert both a § 507(a) priority claim and a separately designated unsecured claim not entitled to priority, a not totally uncommon circumstance with respect to employees and customers whose claims exceed the priority ceilings stated in 11 U.S.C. § 507(a)(4), (a)(5) or (a)(7).

■ Thus, the mere assertion of a secured claim by the creditor, or the mere assertion of a priority claim by a creditor, does not *ipso facto* disqualify a creditor from voting pursuant to 11 U.S.C. § 702(a)(1)/11 U.S.C. § 702(a)(2).

■ Under the foregoing rules, the first step is to determine the "allowable" claims under § 702(a)(1).

One first determines the claims allowable under Fed.R.Bankr.P. 3003(b)(1), *with respect to creditors who did not file a proof of claim prior to the election.* These creditors are the following: Alco Tool Supply, Inc. ($168.38); All American, Inc. ($262.62); Amerigas ($222.25); Aqua Systems ($80.52); Comcast ($337.65); Com-

puter Aided Technology, Inc. ($1000.); Custom Flooring & Surfacing, Inc. ($257.61); Dashser Transport of America ($9061.29); Datagraphic Printers ($3635.80); Eagle USA, Inc. ($1737.69); Fifth Third Leasing ($24,000.); Freeman Manufacturing & Supply Co. ($13,113,13); GE Specialty Film & Sheet ($17,027.64); J & L Industrial Supply ($161.90); Little Pedersen Fankhauser ($3532.10); MAAC Machinery Corporation ($111.56); Martin Securities ($57.40); McMaster–Carr Supply Co. ($157.18); Mercantile Bank ($67,059.88 and $106,419.28); Mortensen CPA Group ($700.); NMHG Financing Services ($1605.76): Tecumseh Corrugated Box Co. ($896.54); Teter Tool & Die ($1419.12); The Loxcreen Company, Inc. ($4370.31); Transportation Logistics Mngmnt ($2010.); Von Tobel Lumber ($1700.53); Wegner Steel ($158.80). The total amount of these "allowable" claims is **$261,264.94.**

The next step is to determine the addition to the claims universe with respect to creditors who filed "allowable" proofs of claim prior to the election, which were not included in claims allowable under Fed. R.Bankr.P. 3003(b)(1), or if so allowable, superceded their scheduled claims by filing a satisfactory proof of claim. These claims are the following: NIPSCO (claim # 1; $7546.74); Langer & Lanqer (claim # 5–1; $1071.75); IRS (that portion of claim # 7–1 allowable under § 702(a)(1)/ 11 U.S.C. § 726(a)(4); $18,919.43); Lincolnway Automotive (claim# 8–1; $92.75); Louise Sturman (claim # 9–1; $48,768.18); [22] Carstens Yee & Cahoon LLP; claim # 10–1; $1059.94; Alex Haidar (claim # 12–1; $1700); Dell Financial claims # s 13 ($1285.43); 14 ($7317.79); and 20 ($1411.20) [23]; Indiana Department of Revenue (the unsecured portion of claim # 15–1; $621.03); Fastenal Company (claim # 18–1; $1574.02); Verizon North, Inc. (Claim# 19–1; $2077.76); Indiana Department of Workforce Development (claim # 23–1; $215.87); Kelly Services, Inc. (Claim # 24–1; $180.); Able Disposal (claim # 25; $694.52); NIPSCO (claim # 28–1; $4884.21) [24]; GE Plastics (claim # 31–1; $34,055 28); John Richard Negrey (claim # 32–1; $163,399.31–$10,000 of this claim is claimed as a priority claim). The total amount of these "allowable" claims is **$286,875.21.**

The total claims universe is thus comprised of claims in the allowable amount of **$548,140.15.** [25]

**22.** Louise Sturman filed claim number 9–1, in which she asserted a priority claim of $10,000 and an unsecured claim of $56,555.95. The debtor's Schedule F stated her uncontested unsecured claim to be $48,768.18. The basis for an assertion of an unsecured claim of $56,555.95 in claim # 9–1 is incomprehensible, and that claim fails to pass the test of Fed.R.Bankr.P.2003(b)(3) that a claim not be "insufficient on its face". Thus, her claim is determined under Fed.R.Bankr.P. 3003(b)(1). Although under Fed.R.Bankr.P. 3003(c)(4), her filed claim supercedes the "allowance" provided by Rule 3003(b)(1), the court holds that when a filed proof of claim is not allowable, the effect of Rule 3003(b)(1) is to be given "effect", if you will. Why else?—the debtor has acknowledged a claim.

**23.** Claim # 17 is an obvious duplicate of claim # 13, and claim # 17 fails to pass the test of Fed.R.Bankr.P.2003(b)(3) that a claim not be "insufficient on its face".

**24.** A facially separate claim from claim # 1.

**25.** Amended claims numbers 2–3 (including an unsecured claim asserted by John and Diane Worstell in the amount of $152,551.49); 4–4 (including an unsecured claim asserted by Worstell Business Trust in the amount of $499, 454.28); and amended claim number 27–2 (including an unsecured claim asserted by John Worstell in the amount of $48,922.41) were not subject to any objection filed as of the date of the election. The inclusion of these claims under 11 U.S.C. § 702(a)(1) will be subsequently addressed.

### B. *Insider Status of John Worstell and the Worstell Business Trust*

The Interim Trustee contends that John Worstell and the Worstell Business Trust are insiders of TBR and thus are disqualified from requesting and voting in an election pursuant to 11 U.S.C. § 702(a)(3). This issue is more easily disposed of than is the issue of "materially adverse" interest in relation to these creditors, and thus this issue is addressed out of sequence, if you will.

There are not many reported decisions which specifically and fully analyze the issue of an 'insider' in terms of 11 U.S.C. § 702(a)(3). However, there are a number of decisions which delve into this concept in a preferential transfer or equitable subordination context. The first place to start is with the definition of an "insider". In this case, TBR is a corporation and, therefore, 11 U.S.C. § 101(31)(B) applies and provides as follows:

(31) The term 'insider' includes—

(B) if the debtor is a corporation—

 (I) director of the debtor;

 (ii) officer of the debtor;

 (iii) person in control of the debtor;

 (iv) partnership in which the debtor is a general partner;

 (v) general partner of the debtor; or

 (vi) relative of a general partner, director, officer, or person in control of the debtor;

■ By virtue of the non-limiting term "includes" in the foregoing provision, courts have construed this to mean that the definition is illustrative rather than exhaustive. *See,* 11 U.S.C. § 102(3); *In re Krehl,* 86 F.3d 737, 741 (7th Cir.1996). Legislative history suggests that, in addi-

tion to the individuals and entities actually named, the term also encompasses anyone with "a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arm's length with the debtor." *In re Krehl,* 86 F.3d at 741 (*citing,* S.Rep. No. 989, 95th Cong.2d Sess., *reprinted in* 1978 U.S.C.C.A.N. 5787, 5810.) In determining insider status, courts have looked to the closeness of the relationship between the parties and to whether any transactions between them were conducted at arm's length. *In re Krehl,* 86 F.3d at 744; *See e.g., In re Holloway,* 955 F.2d 1008, 1011 (5th Cir.1992). The Trustee's theory is that *after* John Worstell was terminated from TBR's board of directors, he maintained his status as an insider, by virtue of the fact that he had been an insider and involved in the dealings of TBR. Secondly, the Trustee contends that after his termination, John Worstell still exercised a sufficient amount of control over TBR, thus rendering him an insider and unable to request an election under § 702.

■ The evidence shows that on September 24, 2002, John Worstell became a shareholder and was appointed as a director and an officer of the debtor, namely vice-president of finance.[26] Additionally, throughout the period beginning on July 16, 2004 through the petition date, John Worstell held approximately 300 shares of TBR, giving him approximately a 19% minority interest in the debtor.[27] However, sometime prior to March of 2006 that changed, and he was stripped of his office and position on the board of directors, as established by the following:

*Worstell's Cross and Direct Examination of John Negry (principal of the Debtor)*

---

26. *See,* Interim Trustee's Trial Exhibit A—Unanimous Consent of Directors of TBR USA, Inc.

27. *See,* Interim Trustee's Trial Exhibit B—Stockholders Agreement.

Q. Now sometime after that, I think early January, John was stripped of his office and his position on the board of directors; is that right?

A. I'm not sure of the time frame, but—or the exact time, but it was sometime after the first of the year, yes.

Q. And he no longer, and after early January of 2006 he no longer was an officer or director of TBR?

A. He was no longer an officer and director after sometime in 2006. I'm not gonna say it was January, February or—it happened before March.

Q. And the reason it happened before March was March was the time that the bankruptcy was filed?

A. Yes.

Q. So he wasn't an officer or director at the time this bankruptcy was filed, was he?

A. No, I don't believe so.

Q. And he was a shareholder though?

A. Yes.[28]

*Worstell's Direct Examination of John Worstell*

Q. Did you ever get notice of the filing of the Chapter 7—or Chapter 11?

A. No. Not that I know of.

Q. How did you find out about that? If you recall.

A. I don't recall.

Q. So you never got any financial information or any other conversations with TBR after you were off the board.

A. No.

Q. And that was when?

A. That was in the first or second week of January.

Q. Of what year?

A. '06.

Q. And they filed a bankruptcy, I believe, sometime in March of 2006? Is that your recollection?

A. I think so, yes.[29]

Clearly, prior to January of 2006, John Worstell—being an officer and director of TBR—was an insider, as that term is defined by 11 U.S.C. § 101(31)(B). With that said, the evidence establishes that sometime prior to March of 2006, John Worstell ceased to have the status of an officer or director. Moreover, the Worstell Business Trust and Diane Worstell had very little involvement, if any, with the affairs of TBR.[30]

The Trustee's relies on the case of *In re Krehl*, 86 F.3d 737 (7th Cir.1996). In that case the debtor, Krehl, was the president, sole shareholder, and director of RTI up until January 4, 1993. Subsequently, on October 4, 1993, RTI filed a voluntary petition under Chapter 11 of the Bankruptcy Code. The corporation ceased doing business. On December 31, 1993, the case was converted to a case under Chapter 7 of the United States Bankruptcy Code. On January 3, 1994, Krehl resigned as president and a director of RTI, but he remained the company's sole shareholder. Shortly thereafter, a receiver was appointed for the corporation. Krehl filed his own bankruptcy petition on January 18, 1994. The Village of Waunakee sought to block discharge of Krehl's debts to it under 11 U.S.C. § 727(a)(2)(B) and § 727(a)(7), on the basis of Krehl's involve-

---

**28.** *See,* Trial Transcript at pg. 108, lines 19–25 through pg. 109, lines 1–10.

**29.** *See,* Trial Transcript at pg. 132 lines 17–25 through pg. 133 lines 1–6.

**30.** *See,* Trial Transcript at pg 66 lines 8–25 through pg. 68 lines 1–7.

ment in relation to RTI in actions which the Village asserted were fraudulent with respect to its interests in RTI. The bankruptcy court denied Krehl a discharge, and he appealed that decision to the Court of Appeals for the Seventh Circuit. Krehl's theory was that he had resigned as president and a director of RTI on January 3, 1994, and that the objectionable conduct occurred after the insider relationship had ended, rendering § 727(a)(7) inapplicable to that conduct. He conceded that he was an insider when he absconded with some of RTI's property, and when RTI purported to sell a substantial portion of its assets to another entity on December 31, 1993, but he took the position that the judgment below should still be overturned due to the fact that he was not an insider at all material times.

The Court of Appeals for the Seventh Circuit disagreed and found that Krehl was the "consummate insider". He owned all of the stock, was the president and director on its board, and knew all there was to know about the corporation. The court stated that in the circumstances of the case, Krehl could not eviscerate his historically close relationship with RTI by simply resigning as officer and director once the corporation converted its case to a Chapter 7.

> Section 727(a)(7) would become toothless, moreover, if insider status could automatically be shed through the largely ministerial act of resignation. We believe that when a control person resigns in this way, a court should look to all of the circumstances to determine whether the relationship between the individual and the corporate entity remains so close that the two could not be said to be dealing at arms length. The bankruptcy court did so here and properly concluded that RTI must be considered an insider in connection with Krehl's personal bankruptcy despite

Krehl's resignation and the subsequent appointment of a receiver. *Cf. In re Allegheny Int'l, Inc.,* 158 Bankr. 332, 339 (Bankr.W.D.Pa.1992) (insider cannot avoid that status for purposes of 11 U.S.C. § 502(b)(4) by resigning immediately before the debtor files its petition); *In re Trans Air, Inc.,* 103 Bankr. 322, 324 (Bankr.S.D.Fla.1988) ("where a director remains in a position to exert considerable influence over the affairs of the debtor corporation, even though the corporation has been sold to a new entity, a bankruptcy court may find that the insider status has not been cured."), *aff'd,* 104 Bankr. 477 (S.D.Fla.1989).

*In re Krehl,* 86 F.3d at 743.

■■■ The Court of Appeals for the Seventh Circuit was quite specific that determining Krehl's status as an insider required a fact sensitive inquiry—one must look at the *totality* of the circumstances. The case did not establish a hard and fast rule that once you are an insider, always an insider you will be. The Trustee's position is that John Worstell, although he was involuntarily terminated in corporate capacities, could not thus simply divorce himself from the corporation as an insider. She argues that John Worstell and TBR were so close that they could not be considered dealing at arm's length. In support of this position, she points to Worstell's testimony at trial in which he indicated that he forestalled the repossession of a router—a critical piece of equipment for operating the business—and financed it himself. She also points to other evidence which shows that he procured insurance for the business, attended board meetings, opened a line of credit for TBR to draw upon, personally guaranteed certain corporate obligations, and obtained an SBA loan and solicited financing for the company.

There is no question that John Worstell was an insider prior to sometime early in 2006. Was he the "consummate insider"—absolutely not. There were other shareholders, directors and officers. Nothing in the record even remotely suggests that John Worstell had the final word on, or was solely responsible for, the business dealings of TBR. To the contrary, the testimony shows that John Worstell was not the one and only decision maker: [31]

The evidence establishes that during his tenure as an officer and director of TBR, John Worstell did not have, and did not exercise, complete and unquestioned authority over the operations of the business, as did the debtor in *Krehl.* Furthermore, this was not a situation in which John Worstell *resigned* and then attempted to divorce himself from his status as an insider—rather, he was *terminated.* Simply put, the potential harm and injustice which the Seventh Circuit Court of Appeals was trying to prevent in *Krehl* is not present in this case. Therefore, the court rejects the contention under this theory that John Worstell was an insider on the date of the Trustee election.

By December of 2005, the relationship between John Worstell and TBR went sour and there seems to be in this case two conflicting versions of the events that transpired at this time. On the one hand the principal of TBR, Richard Negry, testified as follows upon direct examination by the Trustee:

Q. Okay, what happened at the end of 2005 in December, what, what event occurred?

A. Well, I left for the Christmas break and found out that we had been locked out of the building.

Q. What had he done?

A. He got an order from the state court to lock us out. He took possession of the building.

Q. And that was the very end of December of 2005?

A. End of December, I'd say just before Christmas, December 22nd.

Q. And at that point did he maintain complete control of TBR USA, Inc.?

A. Yes.

Q. Right after that lockout did you, did you ask him what happened, what's going on?

A. Yeah, we had exchanged some e-mails and I think we talked to him on the phone and I came up to meet he and Diane and we talked about the business. I brought up an updated forecast of our, of our business, where we were at at that point in time and John offered a job to me. He said he was interested in taking over—continuing the business and wanted to know if I would, you know, run it, run it for him.

Q. And what did you tell him?

A. I said I—and during that first meeting I said I would, I had to think it over, I had to talk to Peter and, and that was it.

Q. And after that meeting did you decide to take his offer or not?

A. No, I decided not to.

Q. Did, did TBR USA, Inc. take any action after the lockout with regard to Mr. Worstell?

A. Shortly thereafter we voted him off the board and we filed bankruptcy and then we got possession of the building back like maybe 10 days

---

31. *See,* Trial Transcript at pg. 15, lines 3–25 through pg. 17, lines 1–6; Trial Transcript at pg. 68, lines 9–15; Trial Transcript at pg. 136 lines 14–18; Trial Transcript at pg. 136, line 25 through pg. 137, 1–25.

after that which was about mid March I think.

Q. So Mr. Worstell maintained control of the premises until after the Chapter 11 Petition was filed?

A. Yes.[32]

John Worstell on direct examination testified as follows:

Q. Well, what did you do, if anything, after that meeting in Las Vegas in November of 2005?

A. Nobody else would loan the money into the corporation.

Q. Well, didn't the, didn't the question come up as to whether or not you would?

A. Well, I, I, I, I said "It depends, I may do that, depends on what I can work out with Richard." Richard after Christmas agreed to be my partner in a corporation, then I never heard from him again, then they threw me off the board, then all this other stuff happened.

Q. Did you ever get notice of the filing of the Chapter 7—or Chapter 11?

A. No. Not that I know of.

Q. How did you find out about that? If you recall.

A. I don't recall.

Q. So you never got any financial information or any other conversations with TBR after you were off the board.

A. No.

Q. And that was when?

A. That was in the first or second week of January.

Q. Of what year?

A. '06.

And they filed a bankruptcy, I believe, sometime in March of 2006? Is that your recollection?

A. I think so, yes.[33]

The foregoing testimony shows that the termination of John Worstell most likely came about because the Worstell Business Trust locked the corporation out of the leasehold due to a default under the lease. Although the versions of the story somewhat differ, the result is the same: the relationship between John Worstell and TBR disintegrated, and he was terminated from his position on the board of directors and proceeded to exercise his rights as a creditor of TBR. In either version, the question arises as to whether John Worstell's status as a creditor is enough to deem him an insider pursuant to 11 U.S.C. § 101 after he was terminated from the board of directors.

This leads us to the next issue raised by the Trustee: whether John Worstell was still in *control* of the debtor as contemplated by § 101(31)(B)(iii) *after* his termination from the board of directors.

▮ To fall into the category of an "insider by control", courts have held that the person or entity must have at least a controlling interest in the debtor. *In re Babcock Dairy Co. Of Ohio, Inc.*, 70 B.R. 662, 666 (Bankr.N.D.Ohio 1986); *In re Louisiana Industrial Coatings, Inc.*, 31 B.R. 688 (Bankr.E.D.La.1983). Alternatively, courts have stated that the person must exercise sufficient authority over the debtor so as to unquestionably dictate corporate policy and the disposition of corporate assets. *In re Babcock Dairy Co. of Ohio, Inc.*, 70 B.R. at 666; *See, In re American Lumber Co.*, 5 B.R. 470 (D.Minn.1980). In this context, control means the "actual exercise of managerial

---

**32.** *See,* Trial Transcript at pg. 17 lines 7–25 through pg. 18 lines1–20.

**33.** *See,* Trial Transcript at pg. 132 lines 7–25 through pg. 133 lines 1–6.

discretion," or "usurping the power of the debtor's directors and officers to make business decisions." *In re Kids Creek Partners, L.P.* 212 B.R. 898, 929 (Bankr. N.D.Ill.1997) (*citing, In re Kids Creek Partners, L.P.,* 200 B.R. 996, 1016 (Bankr. N.D.Ill.1996)). It is insufficient that the alleged insider had only a superior bargaining position in a contractual relationship with the debtor. *In re Babcock Dairy Co. Of Ohio, Inc.,* 70 B.R. at 666. This includes situations where bargaining power is greatly skewed in favor of the lender; otherwise this would invariably be true whenever a the lender is on the verge of terminating a debtor's operations. *Id.* The foregoing is also true of a shareholder—courts have held that a shareholder can be an insider when he/she/it has control of determining corporate policy, whether by personally assuming management responsibility or by selecting management personnel. *In re Sullivan Haas Coyle, Inc.,* 208 B.R. 239, 243 (Bankr. N.D.Ga.1997) (*citing, Estes v. N & D Properties, Inc.,* 799 F.2d 726 (11th Cir. 1986)).

The court in *In re S.M. Acquisition Co.,* 2006 WL 2290990, *5 (N.D.Ill.2006) examined the issue of whether a creditor could be an insider and stated as follows:

> [T]here can be two types of control: de jure and de facto. *Id.* While a structural analysis of the debtor may reveal whether a lender has de jure control, we consider the extent of the lender's actual, managerial control when assessing allegations of de facto control. *Id.* Nonetheless, "control does not exist simply because bargaining power was greatly skewed in favor of the lender" or because the lender and debtor share a close relationship. *Id.* at 1016; *see In re K Town, Inc.,* 171 B.R. at 320; *In re Aluminum Mills Corp.,* 132 B.R. at 894. Rather, the lender's control "must be so overwhelming that there must be, to

some extent, a merger of identity" or a "domination of [the debtor's] will." *In re Kids Creek Partners, L.P.,* 200 B.R. at 1016 (internal quotations omitted). For example, the lender must "exercise sufficient authority ... so as to dictate corporate policy and the disposition of assets." *In re K Town, Inc.,* 171 B.R. at 320; *In re Aluminum Mills Corp.,* 132 B.R. at 894; *see CSY Liquidating Corp. v. Harris Trust & Sav. Bank,* No. 96 C 1216, 1998 WL 157065, at *17 (N.D.Ill. Mar.31, 1998) (finding no de facto control where lender did not select officers or directors of debtor and let it act autonomously).

In *In re F & S Cent. Mfg. Corp.,* 53 B.R. 842, 848 (Bankr.E.D.N.Y.1985), the creditor had a "special relationship" with the debtor through which it could compel payment of its debt. In that case, the debtor was a corporation and a wholly owned subsidiary of the defendant, Buildex, Inc. In June 1982, the defendant sold the debtor to Brunswick Group, Inc. At the time of the sale, the debtor owed Buildex, Inc. $3.249 million. As a part of the transaction, Brunswick was to make available to the debtor $1.499 million dollars, which would be used to reduce the debt owed to Buildex, Inc., the balance to be paid by the debtor in twenty-two equal installments. Buildex and Brunswick executed a stock purchase agreement on June 4, 1982, and the stock was delivered to Brunswick. At the same time, the debtor entered into a loan agreement with a third party bank for the money (the $1.499 million dollars), with Brunswick guaranteeing the loan. The agreement provided that the money was to be transferred to Buildex at the time the stock was delivered to Brunswick. However, pursuant to the stock purchase agreement, the debtor's failure to make the transfer would have resulted in a rescission of Buildex's contract with Bruns-

wick and restored Buildex to full legal control of the debtor. The court held that a creditor such as Buildex, who would reacquire full legal control of a debtor if the debtor failed to make a transfer, has the requisite control over the debtor to be an insider. *Id.* at 848.

Finally, an illustrative case is *UVAS Farming Corporation*, 89 B.R. 889, 893 (Bankr.Dist. New Mexico 1988), which itself cited the following illustrative cases:

The defendant's cases offer other examples of 'control'. The trustee, in *In re Schick Oil & Gas Inc.*, 35 B.R. 282 (Bankr.W.D.Okla.1983), sought to avoid a preference in the form of a mortgage. The Court ruled that an inferior bargaining position, on the part of the debtor, was not enough to make the creditor a control person. Mere financial power is an incident of the debtor-creditor relationship and does not amount to control over the debtor. The transaction was questionable because the debtor had forwarded blank but signed mortgages to the bank for completion and filing at a later time. The Court found, though, that the debtor had properly authorized the bank's actions.

In another case, a lock box system was set up whereby the bank directly received payments due the debtors. As well, weekly meetings between the bank and the debtor were held to review the debtor's situation. These actions did not amount to a stranglehold over the debtor so that the debtor was powerless to act independent of the bank. The bank was found not to be an insider with control. *In re Belco, Inc.*, 38 B.R. 525 (Bankr.W.D.Okla.1984).

*In re Technology for Energy Corp.*, 56 B.R. 307 (Bankr.E.D.Tenn.1985), likens control to actual management of the debtor. Pressure to remove the debtor's chief executive officer, imposition of a consultant, a lock box arrangement and voting control for the purpose of accepting a purchase offer, all by the bank, did not raise the bank to the status of an insider. The Court found that the bank did not control the debtor's personnel or contract decisions, production schedules and accounts payable.

Finally, in *In re Huizar*, 71 B.R. 826 (Bankr.W.D.Tex.1987), a mere personal relationship between the loan officer and the debtor did not amount to insider status. An insider is one who has actual or unreasonable control of the debtor.

In this case, after being terminated from the board of directors, John Worstell exercised his rights as a creditor, obtained a prejudgment attachment order from the state court, and seized the premises which was owned by the business trust. That was it. At trial, a representative of the debtor testified that John Worstell controlled the premises until after the petition for relief was filed and this, the Trustee argues, demonstrates enough control to deem John Worstell an insider. The fallacy in this argument is that control of the premises on which the corporation operated **does not** equate to control of the *business* itself or of its operations. There is nothing in the record which suggests that once Worstell was ousted as a director and officer that he had *any* control over TBR, or had access to any of TBR's books and records, or that he had any involvement in TBR's decision making. In fact, the evidence shows that John Worstell was not even aware that TBR had filed bankruptcy until after the fact. John Worstell's authority and ability to control the corporation, after being terminated from the board, are a far cry from what the debtor had in *Krehl*.

The court finds, based upon the foregoing, that neither John Worstell nor the Worstell Business Trust was an insider

under 11 U.S.C. § 702(a)(3) on the date of the Trustee election.

### C. Material Adverse Interests

■ The critical issue is whether John Worstell, Diane Worstell or the Worstell Business Trust was a creditor which had, "an interest materially adverse, other than an equity interest that is not substantial in relation to such creditor's interest as a creditor, to the interest of creditors entitled to such distribution", pursuant to 11 U.S.C. § 702(a)(2). Again, the critical focal date is the date of the actual election. Again, the establishment of bright line rules is vital to the efficacy of the election process.

Pursuant to 11 U.S.C. § 702(a)(2), a creditor may not request an election or vote for a trustee if that creditor has a "materially adverse" interest. *See,* 11 U.S.C. § 702(a)(2). Neither the Bankruptcy Code nor the Federal Rules of Bankruptcy Procedure defines what constitutes a materially adverse interest. Generally courts have relied on the House and Senate reports which were submitted to Congress prior to enactment of the Code. As noted above, the court is skeptical of utilizing legislative history as a talisman for statutory construction. However, in this particular context—in which a critical term is left for definition by case law—review of legislative history is analytically helpful, although obviously not controlling. As addressed in *In the Matter of NNLC Corp.,* 96 B.R. 7, 8 (Bankr.D.Conn.1989):

Based upon the House Report the materially adverse phrase encompasses the purposes of a conflict of interest rule.

\* \* \*

The House Report states:

Subsection (a) of this section specifies which creditors may vote for a trustee. Only a creditor that holds an allowable, undisputed, fixed, liquidated, unsecured claim that is not entitled to priority, that does not have an interest materially adverse to the interest of general unsecured creditors, and that is not an insider may vote for a trustee. The phrase "materially adverse" is currently used in the Rules of Bankruptcy Procedure, Rule 207(d). It requires a balancing of various factors, such as the nature of the adverse interest, the size of the adverse interest, the degree to which it is adverse, and so on. Thus, a creditor with a very small equity position would not automatically be excluded from voting solely because he holds some equity in the debtor. His equity interest may be so small in relation to his interest as a creditor that it may be disregarded for the purposes of the conflict of interest rule contained in this phrase. The Rules of Bankruptcy Procedure also currently provide for temporary allowance of claims, and will continue to do so for the purposes of determining who is eligible to vote under this provision. [Citation omitted.]

The Senate Report states:

Subsection (a) of this section [702] specifies which creditors may vote for a trustee. Only a creditor that holds an allowable, undisputed, fixed, liquidated, unsecured claim that is not entitled to priority, that does not have an interest materially adverse to the interest of general unsecured creditors, and that is not an insider may vote for a trustee. The phrase "materially adverse" is currently used in the Rules of Bankruptcy Procedure, Rule 207(d). The application of the standard requires a balancing of various factors, such as the nature of the adversity. A creditor with a very small equity position would not be excluded from voting solely because he holds a small equity in the debtor. The

**628**

Rules of Bankruptcy Procedure also currently provide for temporary allowance of claims, and will continue to do so for the purposes of determining who is eligible to vote under this provision. [Citation omitted]

■■■ The foregoing has been interpreted to require a court to utilize a conflict of interest type of analysis, balancing the competing factors in a specific instance to make its determination. *In re Amherst Technologies, LLC, et al.,* 335 B.R. 502, 508 (Bankr.D.N.H.2006); (*citing, In re NNLC Corp.,* 96 B.R. 7, 9–10 (Bankr. D.Conn.1989)); *In re Cohoes Industrial Terminal, Inc.,* 90 B.R. 67, 70 (S.D.N.Y. 1988); *Collier on Bankruptcy,* ¶ 702.03[2] (15th Ed. Rev.). These factors include the nature of the adverse interest, the size of the adverse interest, and the degree to which it is adverse. *Collier on Bankruptcy,* ¶ 702.03[2] (15th Ed. Rev.). The court in *In re Klein,* 119 B.R. 971 974–975 (Bankr.N.D.Ill.1990) (Opinion on Motion to Reconsider), summed this concept up as follows:

The cases thus make clear that material adversity is measured by the effect on the creditor body as a whole, particularly by whether the challenged creditor's interest is such that it would tend to minimize distributions to the other creditors from the estate. Since merely opposing the claim of a single other creditor would not have the effect of minimizing distributions from the estate as a whole, it can fairly be concluded that such an interest does not qualify as materially adverse. Further, claims between creditors do not reduce the size of the estate and, therefore, also do not reduce the amount available for distribution to other creditors. Such claims

are not materially adverse for purposes of § 702.

However, a demonstrated pattern of activity, which effectively does, or tends to, reduce recoveries by the estate, whereby a creditor pursues its own separate recoveries in competition with the estate, falls into the classic pattern of material adversity. This is the same pattern of adversity demonstrated by secured parties, priority claimants, and equity holders, all of whom invariably find the pursuit of their best interests to be at odds with the interests of the general unsecured creditors of the estate by removing assets from the pool. The Code therefore denies them the right to vote for the trustee, the representative of the general unsecured creditors, under § 702(a)(2).[34]

Logically enough, the relevant time to measure a creditor's adverse interest is the date of the election. *In re Klein,* 119 B.R. 971, 975 (Bankr.N.D.Ill.1990).

■■■ Clearly, there are important policy reasons behind the requirement that a creditor requesting the election of a trustee not have a materially adverse interest. *See, In re Williams,* 277 B.R. 114, 118 (Bankr.C.D.Cal.2002). The trustee represents the estate and is charged with the duty to ensure that all similarly situated creditors are treated the same. *Id.* In order to meet this objective, among other things, the Bankruptcy Code empowers the trustee with the ability to avoid preferential and fraudulent transfers and with the statutory tools to challenge whether a secured claim is indeed properly secured. *Id.* Therefore, many courts have concluded that creditors who have received preference payments hold an interest that is

**34.** As noted above, this court does not endorse the last two sentences of the foregoing-cited paragraph.

adverse to the interests of other secured creditors. *In re Amherst Technologies, LLC, et al.,* 335 B.R. 502, 508 (Bankr. D.N.H.2006); *In re Williams,* 277 B.R. 114, 118 (Bankr.C.D.Cal.2002); *In re NNLC Corp.,* 96 B.R. 7, 10 (Bankr.D.Conn. 1999). The intent of § 702(a)(2) is clear: only creditors with allowable, undisputed, fixed, liquidated unsecured claims should be allowed to request an election and vote for a trustee-Congress did not intend to allow creditors who had disputed claims against the estate to participate in an election and choose their opponent. *See, In re San Diego Symphony Orchestra Association,* 201 B.R. 978, 985 (Bankr.S.D.Cal. 1996). As the court in *In re Amherst Technologies, LLC, et al.,* 335 B.R. 502, 508 (Bankr.D.N.H.2006) pointed out:

> Under a conflict of interest analysis, the participation of a potential preference defendant in choosing the trustee who will investigate, prosecute and settle any preference claim against it creates at least the appearance of impropriety. It is axiomatic that the recovery of, or the failure to recover, a preference claim may impact the final distribution to creditors holding allowed unsecured claims.

■ However, the allegation of a preference must be based on more than mere suspicion. *In re NNLC Corp.,* 96 B.R. at 10; *In re Williams,* 277 B.R. 114, 117 (Bankr.C.D.Ca.2002). For instance, in *In re Williams,* 277 B.R. 114 (Bankr.C.D.Cal. 2002), the creditor, Rosemary Swenson, was granted judgment against the debtor on November 29, 2000, in the amount of $145,972.00. She recorded an abstract of judgment on December 20, 2000 and on February 1, 2001, she was awarded a second judgment in the same case in the amount of $29,306.07; which was recorded on February 23, 2001; this was within the 90–day period before the debtor filed his

petition for relief. Swenson filed two proofs of claim, each asserting a secured interest in real property which the creditor valued at $507,000.00. The debtor's Schedule A disclosed two parcels of real estate, one was his residence valued at $430,000.00, and another was a vacant lot valued at $3,000.00. Prior to the recording of the judgments, and between 91 and 365 days before the bankruptcy was filed, the debtor recorded two deeds of trust on his residence: one in favor of his former spouse and the other in favor of his mother. He also gave his mother a deed of trust on the vacant land. If the liens created by the foregoing deeds were not avoided, there would be no equity to support the secured claims. The debtor scheduled Swenson's claim as contingent, unsecured, disputed, subject to setoff and in an unknown amount. Further, the debtor filed objections to both proof of claims, and filed an adversary proceeding against Swenson, on the ground that the liens created by the abstracts were preferential transfers. One of the issues before the court was whether the creditor could request the election of a trustee after the case was converted to a Chapter 11 case.

The court held that the creditor had a materially adverse interest and reasoned as follows:

> Section 702(a)(2) disqualifies a creditor from voting if that creditor has an interest which is materially adverse to the interest of other creditors entitled to distribution under the sections enumerated in § 702(a)(1). While Swenson relies on *Cohoes* for claims estimation, she ignores its discussion of the relationship of a preference to § 702(a)(2). *Cohoes,* 90 B.R. at 70, citing *In re Lang Cartage Corp.,* 20 B.R. 534 (Bankr.E.D.Wis. 1982). When a party has received a preference which is beyond a mere suspicion and in a dollar amount which is more than minimal, she has an interest

materially adverse to that of other creditors who have not received preferences. *See In the Matter of NNLC Corp.*, 96 B.R. 7 (Bankr.D.Conn.1989).

Three of Swenson's four abstracts of judgment were recorded within the 90 day pre-filing preference period. This creates more than a mere suspicion. In *NNLC*, there was over $3 million in unsecured debt and the alleged preference was under $21,000. That Court held that the relation to total claims is irrelevant and the preference was a material adverse interest. Here the smaller Swenson abstract is in an amount of over $29,000. Therefore the interest is material.

There are strong policy reasons for careful enforcement of § 702(a)(2). The trustee is the representative of the estate and has the duty to make sure that all similarly situated creditors are treated alike. For that reason, the Bankruptcy Code arms the trustee with powers to set aside preferences and fraudulent transfers and to object to claims, among other responsibilities. The trustee is required to investigate claims and analyze whether they are disputed. The trustee must decide whether a secured claim is entitled to that status or whether allowing such a distribution would be unfair to unsecured creditors under the Bankruptcy Code. The Trustee will become the plaintiff in the pending adversary complaint against Swenson.

Because of this, the creditor who holds a potential preference and is allowed to select the trustee has a strong self-interest in electing someone who will not challenge her secured claim. Similarly, any creditor with a disputed claim would love to select her future opponent. It is this conflict of interest which § 702(a)(2) seeks to prevent.

By virtue of her probable preferential transfer, Swenson holds an interest which is materially adverse to other creditors who did not receive preferences. Thus, she does not qualify under § 702(a)(2).

*In re Williams*, 277 B.R. at 118.

Courts have also considered the issue as to whether an under-secured creditor, who wishes to vote the unsecured portion of its claim, has a materially adverse interest pursuant to 11 U.S.C. § 702(a)(2). As determined in a prior section of this decision, the mere circumstance that a creditor which asserts an unsecured claim has also asserted a severed/separate secured claim does not cause that creditor to be disqualified by 11 U.S.C. § 702(a)(2). But ... matters in relation to the asserted secured claim may require a different result. Again, like the redundant refrains of popular songs, keep stuck in your mind the policy that bright line rules must be developed and applied: It is a small world, after all.

Principally at issue in this case are three partially unsecured claims: claim # 2–3, which is for amounts owed on an equipment lease between TBR and John Worstell; claim # 4–4, which arises out of a lease between TBR and the Worstell Business Trust for the premises upon which TBR operated; and claim # 27–2, based upon a promissory note between TBR and John Worstell for repayment of an SBA loan. As previously discussed, on appeal, the district court ruled that claim # 3–2 was disputed and that the claimants were not entitled to vote that claim. Each of the remaining claims assert separately designated secured and unsecured components, and state that the security for the stated debt is the "tangible and intangible property" of TBR.

Prior to TBR filing its petition for relief, on December 23, 2005, John Worstell and

the Worstell Business Trust filed a complaint in state court against TBR for breach of an equipment and property leases, and for the pre-judgment attachment of all of TBR's property. That same day, the state court issued an order granting the attachment. As evidenced by an attachment to each of the foregoing three claims, the basis for the secured component of each of the foregoing claims is the attachment order entered by the state court.

The Trustee argues that the attachment lien was transferred within the ninety (90) days prior to TBR's filing of its Chapter 11 petition, to John Worstell and the Worstell Business Trust for their benefit on account of an antecedent debt, while the debtor was insolvent. Therefore, according to the Trustee, the lien arising from the prejudgment attachment was a preferential transfer pursuant to 11 U.S.C. § 547. As a result, the Trustee contends, both John Worstell and the Worstell Business Trust possess interests that are materially adverse to the other unsecured creditors of the estate and are prohibited from requesting an election or voting for a trustee.[35]

Secondly, the Trustee argues that John Worstell and the Worstell Business Trust have interests which are materially ad-

verse to other creditors due to the fact that by utilizing 11 U.S.C. § 544, she could potentially avoid the foregoing lien interest. In fact, on March 24, 2006—prior to TBR converting to a Chapter 7 liquidation—TBR as the debtor-in-possession filed an adversary proceeding (Case Number 06–6091) requesting, among other things, that the lien created by the attachment order be avoided pursuant to 11 U.S.C. § 544. This case is still pending, and is now the province of whatever trustee is appointed to pursue or decline to pursue.

On the other hand, the Worstells' position is that they are not secured due to the fact that a UCC sale occurred after the election, in which the collateral affected by the prejudgment attachment was sold, thus rendering them unsecured: "The evidence [indicates] that in reality, the [sic] Respondents secured claim is worthless in light of the UCC sale conducted by the DIP lender pursuant to the stay relief motion."[36] Additionally, the Worstells argue that during the pendency of the Chapter 11 proceeding, "this court questioned the validity of the Respondent's pre-judgment attachment lien that forms the basis for the alleged preferential transfer". The Worstells cite no authority which supports the theory that although a creditor is se-

---

**35.** The Trustee also argues that 11 U.S.C. § 502(d) requires that when a transfer is avoided pursuant to § 547, the transferee is required to turn over to the estate the property transferred, and if that is not done, the claim is disallowed. According to the Trustee, because there is no evidence that John Worstell or the Worstell Business Trust turned over the property secured by the attachment order, their claims should be disallowed. This argument somewhat puts the cart before the horse: the relevant standard is not whether the transfer is actually avoidable under § 547, but whether the preference assertion is beyond "mere suspicion" and, if so, does that constitute a materially adverse interest. 11 U.S.C. § 502(d) requires as a predicate that the transfer have been avoided,

which is not the issue currently before the court, and the court therefore rejects this contention. However, the *potential* for application of 11 U.S.C. § 502(d) does implicate 11 U.S.C. § 702(a)(1)'s requirement of an "allowable" unsecured claim, and this potential—if the Trustee's preference assertion satisfies the "beyond mere suspicion" test—would cause the unsecured claims asserted by claims numbers 2–3, 4–4 and 27–2 to fail to pass the bright line standard of 11 U.S.C. § 502(d).

**36.** *See,* Respondents John Worstell & Diane Worstell and the Worstell Business Trust's Trial Memorandum at pg. 21.

cured by challenged and/or challengeable liens as of the date of the election, there is no materially adverse interest because the creditor was rendered completely unsecured shortly after the election. In addressing the preference issue, the Worstells' only argument is that at some point during the pendency of the Chapter 11 case, this court questioned the validity of the attachment lien [37].

 Given the voting restrictions imposed by § 702, Congress did not intend that creditors against whom the estate could or did assert claims affecting those creditors' stake in the Chapter 7 distributive pot—be allowed to participate in an election and have the opportunity to choose their opponent. This maintains both the legitimacy of the election and, at the very least, helps to ensure that any subsequent proceedings in the case will be fair and equitable for all who participate. However, as recognized by several other courts, the legislative history behind § 702 indicates that one should examine the totality of the circumstances when analyzing whether a creditor's interest is materially adverse.

 The following are the reasons why the unsecured portions of claims numbers 2–3, 4–4 and 27–2 fail to pass the bright line standard of 11 U.S.C. § 502(a)(2):

(1) On December 12, 2006, ALF filed its motion for stay relief in TBR's case, alleging that its post-petition DIP loan was in default in the amount of $128,700.00; that the loan had first priority lien status and was secured by *all* of TBR's assets; and that TBR, by its own admission in its schedules, had estimated a liquidation value of said assets in the amount of $60,000.00. Subsequently, on December 16, 2006, the Trustee objected to the motion, stating that "there may be equity in the subject [sic] real estate for the benefit of creditors and requests a hearing on same." [38] Next, on December 20, 2006, the Trustee filed a document entitled, "Trustee's Notice of Abandonment" in which the Trustee expressed her intent to abandon:

> All inventory, equipment, tools, furnishings, the 1994 Ford Ranger, 2005 Pace American trailer, intellectual property, customer lists and trademarks, if any, and all computers with the exception of the Dell Power Edge SC420 which houses the Debtor's books and records.

The record reflects that the foregoing was served on all creditors and parties-in-interest, and that the deadline to object to the Notice was January 4, 2007–the date of the election. On January 19, 2007, the Trustee entered into an agreed order with ALF which allowed it to foreclose its lien against and obtain possession of the personal property of TBR subject to ALF's lien. The order lifting the stay specifically listed the following:

> All inventory, equipment, tools, furnishings, the 1994 Ford Ranger, 2005 Pace American trailer, intellectual property and trademarks, if any, and all computers.

ALF and the Trustee agreed that all other issues raised in the motion were to remain unresolved and could be raised by either party at a later time. Lastly, it was agreed that once the Trustee had obtained the data needed from the Dell Power Edge SC420, it could be turned over to ALF as well. The attachment order obtained by John Worstell and the Worstell Business

---

37. Whatever the court may state in passing at a hearing is not a determination of the court unless formalized as required by Fed. R.Bankr.P. 7052/ Fed.R.Civ.P. 52(a).

38. Pursuant to the schedules, TBR owns no real estate—only tangible and intangible personal property.

Trust in state court on December 23, 2005 is quite expansive and includes all the foregoing items listed by ALF and the Trustee, and also includes a catch-all provision which attaches "all other property, tangible and intangible, in which TBR has any right, title or interest." Thus, according to ALF, it had a first priority lien on *all* of TBR's assets, and the record reflects that there were no other assets except the items listed by the Trustee in her Notice of Abandonment and in the subsequent agreed order lifting the stay. Throughout these proceedings the Trustee has not disputed the contention that all the assets of TBR were liquidated at a UCC sale after the election occurred. The point is that the evidence points to the fact that all of the assets which secured the Worstells entities' state court attachment lien were all of the assets owned by TBR, all of which the Trustee was apparently prepared to abandon. The testimony elicited at trial further supports this conclusion:

*Worstell's Cross and Direct Examination of John Negry (principal of the Debtor)*

Q. Now TBR in its schedules filed with this Court in the Chapter 11 listed certain assets that were owned by the company; is that right?

A. Rephrase your question?

Q. TBR listed on its schedules filed with the bankruptcy court a list of assets.

A. Right.

Q. My recollection is, I don't have the schedules in front of me, but my recollection is that the, that the—all the assets of TBR were valued at $65,000. Do you recall that?

A. Yes.

Q. Were those schedules ever amended or changed when you filed the Chapter 7?

A. I'm not aware. I don't recall.

Q. Well, were there any additions or deletions to, to the value of those assets or the assets themselves when you filed from Chapter—when you converted from Chapter 11 to Chapter 7?

A. There would have been, there would have been some inventory that was used, but that's about, about it.

Q. So the 65,000 would have been even less?

A. Could have been, I'm not sure. I'd have to take a look at the schedules of inventory to make that determination.

Q. But that was the only change was a reduction in the inventory?

A. Yeah, there was no assets. We didn't have any assets that I'm aware of, physical assets.

Q. Now what happened to those assets in the Chapter 7?

A. They went through a sale and they were purchased out by ALF.

Q. The DIP lender?

A. Right.

Q. And that was after the exhibit, the Motion for Relief from the Stay that we looked at, I think that was Exhibit Number 5, after they obtained stay relief from this court?

A. Right.

Q. And they went to a sale and they purchased them?

A. Right.

Q. Do you know what they paid for them?

A. No.[39]

39. *See,* Trial Transcript at pg. 10, line 12 through pg. 112, line 1.

The question is: if the Trustee intended to abandon these assets, which were all the assets securing the attachment lien, where is the materially adverse interest of the Worstell entities? The § 544 action and any possible preference claim against John Worstell and the Worstell Business Trust lie in the security interest created in their favor by the attachment order on these assets—assets which the Trustee had decided prior to the election to abandon and to not administer.

The over-arching problem is that even if all of TBR's assets were sold at a subsequent UCC sale, abandonment did not occur until *after* the election. *As of the date of the election*, the subject claims were asserted by the Worstell entities to be partially secured, and those assertions of secured status were the focus of an avoidance action, and potential preference actions. Although the Trustee may have opined to abandon the assets of TBR, all creditors of this estate had until midnight on January 4, 2007, in which to file an objection to the abandonment. If an objection to the abandonment had been filed, the Worstell entities' conflicted and challengeable lien interests in the assets would have remained subject to their assertion of secured status, a status obviously materially adverse to the interests of general unsecured creditors in the distributive pot potentially derived from those assets because of the nature of the challenges to the lien interests. The Worstell entities should not be permitted to be in a position to elect a trustee of their choosing who would ultimately resolve the objection. The Worstells argue that, "the allegations concerning a preferential transfer are now moot in that the prejudgment attachment was not bid in the UCC sale. Any preference did

not affect the distribution to unsecured creditors because it created no recovery for the respondents."[40] The problem is that this circumstance occurred *after* the election took place. Thus, *at the time of the election, due to litigation both pending and foreseeable concerning their secured status in relation to property of the estate*, John Worstell and the Worstell Business Trust had materially adverse interests under 11 U.S.C. § 702(a)(2).

■■■■ (2) Even if the property had been abandoned prior to the election, the pendency of the state court litigation initiated by the Worstell entities would have disqualified the Worstells. As discussed, § 702(a)(2) calls for a conflict of interest type of analysis. There is no question that a party subject to litigation would have a conflict of interest in being permitted to choose their opponent. Moreover, and perhaps more tellingly, the debts asserted in claims numbers 2–3, 4–4 and 27–2 were the subject of a lawsuit initiated by John Worstell and the Worstell Business Trust as plaintiffs, and were challenged and/or challengeable in that case. These debts were therefore not "undisputed, **fixed, liquidated,** unsecured" claims within the requirements of 11 U.S.C. § 702(a)(1), because a focus of the litigation was in part to *liquidate* the amount of these debts and to *fix* TBR's liability for those amounts . . . circumstances which had not been effected as of the date of the election by the entry of a final judgment. Once again, a bright line rule is necessary. The concept of a liquidated claim under various provisions of the Bankruptcy Code—e.g., 11 U.S.C. § 109(e)—has been the subject of extensive litigation, and is so nebulous that many times a court's determination is required to establish whether or not a claim

---

**40.** *See,* Respondents John Worstell & Diane Worstell and the Worstell Business Trust's Trial Memorandum at pg. 24.

is "liquidated." This time consuming involvement by the court, and the resulting delay in full administration of a case, is to be avoided at all costs with respect to § 702 elections. Moreover, 11 U.S.C. § 702(a)(1) mandates that a claim not only be "liquidated", but also that a claim be "fixed". If, at the time of the election, a creditor is involved in litigation which has as its subject, in whole or in part, an action to determine the amount of the debt owed by the debtor to the creditor, that debt/claim has not been "fixed" for the purposes of § 702(a)(1) if a final judgment has not been entered with respect to that action. That is the case here, and the "unsecured" claims of John Worstell and of the Worstell Business Trust fail for this reason as well.

Based upon the foregoing, the court finds that John Worstell and the Worstell Business Trust had materially adverse interests to the creditors of the estate pursuant to 11 U.S.C. § 702(a)(2) on the date of the election; that the unsecured claims asserted by them failed to satisfy the requirements of 11 U.S.C. § 702(a)(1); and that therefore neither John Worstell nor the Worstell Business Trust was entitled to request an election pursuant to 11 U.S.C. § 702(b) or to vote their purportedly unsecured interests in claim numbers 2–3, 4–4 or 27–2.

■ Next, the Trustee has challenged Diane Worstell's ability to vote as a joint creditor as to claim # 2–3. The basis for this challenge is that the claim is based on the lease of a router and that the only parties to the lease agreement were solely John Worstell and TBR. Therefore, since Diane was not a party to the lease, the Trustee contends that she cannot be a creditor with regard to that claim. The Worstells simply argue that the evidence shows that Diane Worstell is not an insider, did not have control over TBR and is

not related to John Worstell and, therefore, "is entitled to vote her interest in Claim Nos. 2, 3 and 4 in favor of the election of a Trustee and in favor of Dan Freeland as Trustee."

■ The record sustains the Trustee's contention. The only documentation attached to claim number 2–3 relates to the lawsuit filed by John Worstell and the Worstell Business Trust; there is NO documentation or other indication in that claim that Diane Worstell is owed a debt by TBR, and thus the claim falls within the provision of Fed.R.Bankr.P.2003(b)(3) and her claim is not entitled to vote because it is "insufficient on its face"; *See*, Fed. R.Bankr.P. 3001(c), requiring a writing upon which a claim is based to be attached to the proof of claim. Moreover, it is impossible to sever whatever undisclosed interest Diane Worstell may have had in the debt from the disqualified interest of her husband in that "joint" claim. If a creditor asserts a claim jointly with a disqualified claimant, that creditor's right to vote lives or dies with the qualification of the joint claimant. Diane's right to vote was stilled by this concept, as well. The court finds that Diane Worstell is not entitled to request an election pursuant to 11 U.S.C. § 702(b) or to vote her purportedly unsecured interest in claim number 2–3.

D. *Improperly Solicited Proxies and Invalid Proxies*

Every aspect of this election has been disputed right down to the forms that were used to grant a power of attorney, and allegations of improper solicitation of proxies. The Trustee first argues that the Worstells improperly solicited the proxy of the creditor Langer & Langer. Fed. R.Bankr.P.2006 allows the use of proxies and provides in pertinent part:

(b) Definitions.

(1) *Proxy.*

A proxy is a written power of attorney authorizing any entity to vote the claim or otherwise act as the owner's attorney in fact in connection with the administration of the estate.

(2) *Solicitation of proxy.*

The solicitation of a proxy is any communication, other than one from an attorney to a regular client who owns a claim or from an attorney to the owner of a claim who has requested the attorney to represent the owner, by which a creditor is asked, directly or indirectly, to give a proxy after or in contemplation of the filing of a petition by or against the debtor.

(c) Authorized solicitation.

(1) A proxy may be solicited only by (A) a creditor owning an allowable unsecured claim against the estate on the date of the filing of the petition; (B) a committee elected pursuant to § 705 of the Code; (C) a committee of creditors selected by a majority in number and amount of claims of creditors (I) whose claims are not contingent or unliquidated, (ii) who are not disqualified from voting under § 702(a) of the Code and (iii) who were present or represented at a meeting of which all creditors having claims of over $500 or the 100 creditors having the largest claims had at least five days notice in writing and of which meeting written minutes were kept and are available reporting the names of the creditors present or represented and voting and the amounts of their claims; or (D) a bona fide trade or credit association, but such association may solicit only creditors who were its members or subscribers in good standing and had allowable unsecured claims on the date of the filing of the petition.

(2) A proxy may be solicited only in writing.

(d) Solicitation not authorized.

This rule does not permit solicitation (1) in any interest other than that of general creditors; (2) by or on behalf of any custodian; (3) by the interim trustee or by or on behalf of any entity not qualified to vote under § 702(a) of the Code; (4) **by or on behalf of an attorney at law**; or (5) by or on behalf of a transferee of a claim for collection only. (Emphasis supplied).

■ The Trustee argues that the Worstells do not fit any of these categories due to the fact that Fed.R.Bankr.P. 2006(c)(2) requires that a proxy be solicited in writing by the creditor. At trial, the Worstells presented no evidence that they solicited the Langer & Langer proxy in writing. Rather, the only evidence before the court regarding the solicitation are Worstells' Exhibits 6 and 6a, which were letters from Attorney Gouveia to Langer & Langer concerning the proxies. As the Trustee points out, solicitation by an attorney at law is expressly prohibited under Fed.R.Bankr.P.2006(d)(4). In their brief, the Worstells did not respond to this contention. The Court determines that the Trustee is correct: the proxy was improperly solicited. Thus, the vote of Langer & Langer in relation to the election is thrown out.

Although unnecessary to this decision's determination, the next issue relates to the proxy forms themselves. According to the Trustee, except for the form used for the creditor Langer & Langer, the proxy forms as to John Worstell, Diane Worstell and the Worstell Business Trust are improper in that they were not properly acknowledged. In support of this theory, the Trustee cites the court's decision in the case of *In re Stubbs*, 330 B.R. 717 (Bankr. N.D.Ind.2005). As the Worstells point out, *Stubbs* is inapplicable here and dealt with the validity of a mortgage acknowledgment under *state* law and whether the

acknowledgment provided sufficient notice to a hypothetical third party purchaser of real estate for purposes of utilizing the trustee long arm powers under 11 U.S.C. § 544 in avoiding the mortgage. Here, the Trustee argues:

> Sufficient authorization through a proxy is dictated by Federal Rules of Bankruptcy Procedure, Rule 9010(c). This rule is supplemented by official forms 11A and 11B. Rule 9010(c) requires that the power of attorney shall be acknowledged and shall conform substantially to the official forms. Both official forms require the acknowledgment specifically states who appeared before the attesting officer to acknowledge his or her execution of that proxy. None of the Worstells' proxies bear this type of acknowledgment.[41]

■ The problem with this argument is that the official forms only require that the acknowledgment specifically state who appeared before the attesting officer when the creditor is a partnership or a corporation. John Worstell, Diane Worstell, and the Worstell Business Trust are neither a partnership nor a corporation. Upon examination of the proxy forms utilized by the Worstells, the court finds that they conform exactly to that which is required by the official forms 11A and 11B, and were valid against the trustee's attack on this theory.

### CONCLUSION

Based upon the findings of fact and conclusions of law stated above, the court determines that *no* creditor which attempted to vote at the January 4, 2007 election for trustee was entitled to vote— either to request the holding of an election under 11 U.S.C. § 702(b), or to elect a trustee under 11 U.S.C. § 702(c). As a result, pursuant to 11 U.S.C. § 702(d), interim trustee Stacia L. Yoon shall serve as the Trustee in this case

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that because no trustee was elected in accordance with 11 U.S.C. § 702 at the first meeting of creditors held on January 4, 2007, Stacia L. Yoon, the interim trustee, shall serve as the trustee in this case.

---

**41.** *See,* Brief in Support of the Interim Trustee's Motion for Resolution of Dispute at pg. 17.